## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ANN W. TILLER, as Personal Representative
of the Estate of
CLARK E. TILLER, deceased,

CASE NO.  3:03-cv-489-J-32HTS

        Plaintiff,

vs.

FORD MOTOR COMPANY, a foreign
corporation

        Defendant.

_____

### ORDER[1]

    This case comes before the Court on Defendant Ford Motor Company's

Renewed And Amended Motion for Summary Judgment on Plaintiff's Claim for

Punitive Damages (Doc. 144); Defendant's Motion to Exclude and/or Limit the

Testimony of Plaintiff's Expert Allan J. Kam (Doc. 146); Defendant's Motion to

Exclude and/or Limit the Testimony of Plaintiff's Expert Thomas J. Feahney (Doc.

148); and Defendant's Motion to Limit the Testimony of Plaintiff's Expert Larry L.

Bihlmeyer (Doc. 150).  Plaintiff responded to each of these motions.  (Docs. 174,

175, 189 and 190).  The issues presented are: (1) what state's law, Michigan or

_____

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motions or matters addressed herein and is not intended for official publication or to serve as precedent.

Florida, applies to plaintiff's claim for punitive damages, and if Florida law applies, whether plaintiff has met the proper evidentiary threshold and illustrated a triable issue of fact on her punitive damages claim; and (2) whether plaintiffs' expert witnesses Larry L. Bihlmeyer, Allan J. Kam and Thomas J. Feahney satisfy the requirements for expert testimony set forth by the Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137 (1999).

Plaintiff also filed six motions in limine (Docs. 123, 126, 127, 128, 129, and 131); defendant responded to each (Docs. 164, 166, 168, 169, 171, and 173). Defendant filed twenty-four motions in limine (Docs. 112 (omnibus motion), 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 124, 125, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, and 153); Plaintiff responded to each (Docs. 159, 160, 161, 162, 163, 165, 167, 170, 172, 176, 177, 178, 180, 181, 182, 183, 184, 185, 186, 187, 188, and 191).  Defendant also filed an objection to Magistrate Judge Snyder's Order Dated January 4, 2006 (Doc. 203); Plaintiff filed a response (Doc. 221).

## I.    BACKGROUND

On May 30, 2001, Clark Tiller was traveling with his wife, Ann Tiller, on Interstate 95 in the southbound lane near Ridgeland, South Carolina, when the Tiller's 1995 Lincoln Town Car ("Town Car") was struck from behind by a truck.

2

As a result of the collision, the Tiller's Town Car rolled over.  Clark Tiller died during the accident.  Mrs. Tiller, as the personal representative of Clark Tiller's estate, filed suit in Florida state court in Duval County; defendant removed the case to this court (Doc. 1).  In the Complaint, plaintiff asserts strict liability and negligence claims against defendant, Ford Motor Company ("defendant"), claiming that the 1995 Lincoln Town Car ("Town Car") contained manufacturing and design defects that rendered it defective pursuant to Florida's crashworthiness doctrine.

## II.     DISCUSSION

### A.     Punitive Damages

#### 1.     Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  Id. at 249-50.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  In re Optical

3

Technologies, Inc., 246 F.3d 1332, 1334 (11th Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## 2.   Application

The parties posit that the threshold inquiry for the assessment of punitive damages is whether Florida or Michigan law applies.  In a diversity case, such as this, a federal court must apply the conflicts of law doctrine of the forum state to determine what state law applies.  Klaxon Co. V. Stentor Mfg., 313 U.S. 487, 496 (1941).  Florida employs the most significant relationships test, which is set forth in the Restatement (Second) of Conflicts of Laws, to assess choice of law questions.  Bishop v. Florida Specialty Paint Co., 389 So. 2d 999 (Fla. 1980); Restatement (Second) Conflict of Laws §§ 145, 146.  That doctrine provides the substantive law of the situs of the accident, in this case South Carolina, applies unless there is a state with a more significant relationship to the particular legal issue at hand.  Bishop, 389 So. 2d at 1001; Restatement (Second) Conflicts § 145.  Here, since it is pure happenstance that the accident occurred in South Carolina and South Carolina otherwise has no significance to the issues presented, either Michigan or Florida law applies.

While the parties apparently agree that Florida law applies to issues of liability and compensatory damages, courts are normally charged with determining the applicable law for each issue in the case.  Mezroub v. Capella,

4

702 So. 2d 562, 565 (Fla. 2d DCA 1997).  Under Michigan law, punitive damages

are unavailable to a plaintiff in a products liability case such as this.  McAuley v.

Gen. Motors Corp., 578 N.W. 2d 282, 285 n.8 (Mich. 1998), *overruled in part on*

*other grounds by* Rafferty v. Markovitz, 602 N.W. 2d 367 (Mich. 1999).

Under Florida law, punitive damages are governed by § 768.72, Florida

Statutes.  That statute articulates the legal standards and framework to utilize in

assessing punitive damages claims.  A defendant may be held liable for punitive

damages if the trier of fact finds by clear and convincing evidence that the

defendant is guilty of intentional misconduct or gross negligence.  Fla. Stat. §

768.72(2).

"'Intentional misconduct' means that the defendant had actual knowledge

of the wrongfulness of the conduct and the high probability that injury or damage

to the claimant would result and, despite that knowledge, intentionally pursued

that course of conduct, resulting in injury or damage."  Id.  "'Gross negligence'

means that the defendant's conduct was so reckless or wanting in care that it

constituted a conscious disregard or indifference to the life, safety, or rights of

persons exposed to such conduct."  Id.

In a case, such as this, where a corporation is involved, punitive damages

may be imposed based on the actions of an employee or agent of the corporation

only if the plaintiff meets the requirements of subsection (2) and at least one of

the following conditions codified in subsection (3):

5

    (a)     The...corporation...actively and knowingly participated in such conduct;

    (b)     The officers, directors, or managers of the...corporation...knowingly condoned, ratified, or consented to such conduct; or

    (c)     The...corporation...engaged in conduct that constituted gross negligence and that contributed to the loss, damage, or injury suffered by the claimant.

Fla. Stat. § 768.72(3).

The Court recognizes that applying the most significant relationships test renders it a close call as to whether Michigan or Florida law applies to plaintiff's claim for punitive damages.  The Court, however, pretermits that decision because even assuming, *arguendo*, that Florida law applies, it finds defendant is entitled to summary judgment on plaintiff's claim for punitive damages.

In its motion, defendant asserts that plaintiff has failed to allege or procure any facts showing a triable issue on punitive damages because it is undisputed that the roof of the Town Car was designed to, and, in fact, did comply with applicable government standards.[2]  In response, plaintiff relies solely on the affidavit and expert report of its roof design expert, Larry L. Bihlmeyer, to establish that defendant fell far short of industry standards in constructing a roof in the 1995 Town Car that would provide a sufficient survival space in the event of a rollover accident.  (Docs. 44-7, 44-10, 210-2, ¶¶ 10-14).  Mr. Bihlmeyer's

---

[2]    See 49 C.F.R. § 571.216 (Federal Motor Vehicle Safety Standard 216 (FMVSS)).  That standard applies to roof crush resistance in vehicles.

expert report essentially posits the same, that the 1995 Town Car roof's structural integrity was such that it did not allow for the industry standard amount of survival space (33.67 inches) in the event of a rollover accident; instead, the Town Car only provided for "19.0 inches of static and 15.5 inches of dynamic survival space at the front seat driver position." (Doc. 44-8, p. 10, ¶¶ C.5 - C.6). Mr. Bihlmeyer also asserts that defendant's own internal standards for survival space after a roof deformation accident was in excess of 30 inches, and the Town Car fell far short of that. (Id. at Ex. "B").

At oral argument during the January 20, 2006 pre-trial conference, plaintiff's counsel essentially conceded this issue. Viewing the evidence in the light most favorable to plaintiff and after reviewing the applicable Florida case law, the Court finds that plaintiff fails to meet the standards under Florida law to survive summary judgment and seek punitive damages from the jury. While the evidence presented is indeed sufficient to establish a triable issue of fact on the issue of liability under a crashworthiness theory, no reasonable factfinder could find that plaintiff has shown by clear and convincing evidence that defendant engaged in or condoned "intentional misconduct" or "grossly negligent" conduct meriting an award of punitive damages. See Fla. Stat. § 768.72(2)-(3).

### B.   Daubert Motions

## 1.    Applicable Standards

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.  In Daubert, the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert scientific testimony, 509 U.S. at 592-93, and subsequently made it clear in Kumho Tire that the "gatekeeping" role also applies to all technical expert testimony.  Kumho Tire, 526 U.S. at 147.  In performing its gatekeeping function, the Court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).  While there is inevitably some overlap among the basic Daubert requirements,

qualifications, reliability, and helpfulness, they should remain distinct concepts and courts should avoid conflating the analysis.  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).

As to the qualification requirement, Rule 702 makes clear that expert status may be based on "knowledge, skill, experience, training, or education."  Frazier, 387 F.3d at 1260-61 (citing Fed.R.Civ.P 702).   While there is no set test for reliability, the Daubert court identified several factors including: (1) the testability of the expert's hypothesis (whether they can or have been tested); (2) whether the expert's methodology has been subjected to peer review; (3) the rate of error associated with the methodology; and (4) whether the methodology is generally accepted within the scientific community.  Quiet Tech, 326 F.3d at 1341 (citing Daubert, 509 U.S. at 593-94).

The proponent of the expert testimony bears the burden of proving that the Daubert requirements are satisfied.  McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004).  "The Supreme Court did not intend, however, that the gatekeeper role supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Id. at 1299 (quotations and citations omitted).

## 2. Larry L. Bihlmeyer

9

Mr. Bihlmeyer is an engineer who worked for Ford from 1972 - 1986 as a product design and safety engineer.  (Doc. 151-2).  During his employment with Ford, Mr. Bihlmeyer obtained a Masters Degree in Mechanical Engineering from Wayne State University (1975), and received extensive training from Ford, including approximately 14 engineering courses, in the proper methodology used to design automobiles.  (Id.)  As a product design engineer, Mr. Bihlmeyer worked on the design and development of the roof and body structure of the 1986 Ranger Super Cab model (a pick-up truck).  (Id.).  This included the development of the roof and body panels for the design, and the review, selection and recommendation of the proper materials for use in the design.  (Id.).  Since 1987, Mr. Bihlmeyer has worked as an independent automotive and safety engineer, and has served as an expert witness in multiple cases.  (Id.).

Mr. Bihlmeyer essentially concludes that, according to generally accepted automobile manufacturing standards, the 1995 Lincoln Town Car contains a number of design defects concerning the structural integrity of the roof and the resulting available survival space after a rollover accident.  While Defendant concedes that "Bihlmeyer is a seasoned expert witness who is skilled and is competent to testify as to certain engineering issues," it assails Mr. Bihlmeyer's qualifications and scientific basis to testify concerning whether: (1) defendant properly tested the roof of the Town Car, (2) defendant failed to warn end users of the Town Car's inadequate crashworthiness; (3) the windshield of the Town

10

Car involved in the accident was improperly bonded and attached; (4) the driver side seatbelt was rendered ineffective because of the roof defects; (5) defendant knew of safety hazards in the vehicle and determined to pass them on to the consumer, rather than remediate them; (6) defendant built into the cost of the Town Car its anticipated cost of covering lawsuits based on the defects in the 1995 Town Car; and (7) the cost of enhancing the quality of the Town Car's roof so that it complied with applicable industry standards was only $10 - $20. Defendant further moves to preclude plaintiff from introducing alleged bad acts of Ford.  The "bad act" is the alleged statement that Mr. Bihlmeyer's supervisor while he was at Ford, Mr. Larry Schrock, made to Mr. Bihlmeyer and others at the conclusion of a meeting in the 1980's that it was "okay to kill people."  While defendant does not seek to exclude Mr. Bihlmeyer's testimony in its entirety, it petitions the Court to limit his testimony in the specifically listed areas.

### a.   **Failure to Properly Test**

Defendant assails Mr. Bihlmeyer's qualifications for testifying that its roof crush testing of the Town Car was inadequate, and that his proposed roof crush standards are not reliable as they have not been sufficiently tested or adopted in the automotive industry.  In her response, plaintiff points out Mr. Bihlmeyer's vast experience as a mechanical engineer, and that he has reviewed "over 960 vehicle tests, on various vehicles and model years, involving direct impact to the

11

roof/pillar structures."  There is no dispute that Mr. Bihlmeyer is qualified as a

mechanical engineer to provide expert opinion as to the structural integrity of the

roof on the Town Car.  Though Bihlmeyer does not have vast experience in roof

testing, the Court deems this area a logical extrapolation of his testimony

concerning roof strength and integrity.  Thus, the Court will allow Mr. Bihlmeyer to

provide his expert opinion on proper roof testing, which will undoubtedly be

subject to vigorous cross examination by defendant.  See McDowell, 392 F.3d at

1299.  Thus, this portion of defendant's motion is due to be denied; this ruling,

however, is without prejudice if defendant elects to make a timely objection at trial

and present further argument to the Court.

### b.   Failure to warn for lack of crashworthiness

Defendant assails Mr. Bihlmeyer's conclusion that defendant should have

provided a sufficient warning to end users of the 1995 Town Car's purported lack

of crashworthiness.  Plaintiff responds that Mr. Bihlmeyer, due to his expertise as

a mechanical engineer, ought not be confined to testifying as to the structural

integrity of the roof and the inherent dangers with that structure.  In support of its

argument, plaintiff cites Meneely v. Denman Tire Corp., 1995 WL 902213, *4

(N.D. Fla. 1995).  Ironically, the Meneely decision supports defendant's grounds

to exclude Bihlmeyer's testimony on this issue.  Id.  While the Meneely court

allowed the expert, Milner, a metallurgical engineer specializing in failure analysis

12

and predictive failure analysis, to provide expert opinion concerning the inherent dangers in the products in question, he was not an expert on designing warnings, and thus deemed unfit to testify as to the best way to convey warnings to users of products. Id. at *5.

Throughout the course of this litigation, Mr. Bihlmeyer has apparently developed his own warning for use in the 1995 Town Car. During his December 14, 2004 deposition, Mr. Bihlmeyer stated that he had not drafted a warning for the vehicle at issue. (Doc. 151-7, Ex. "B," Bihlmeyer Dec. 14, 2004 Dep. at p. 166, line 18 - p. 169, line 23). At his August 23, 2005 deposition, Mr. Bihlmeyer stated that he had drafted a purportedly sufficient warning label from warning labels existing in "millions of vehicles." (Doc. 151-9, Ex. "D," Bihlmeyer Aug. 23, 2005 Dep. at p. 17, line 21). Mr. Bihlmeyer admitted, however, that his warning has not been peer reviewed for sufficiency by any human factors or other expert. (Id. at p. 17, line 13 - p. 18, line 24). Plaintiff also fails to show whether Mr. Bihlmeyer has ever drafted a warning for any vehicle, which has been subjected to peer review or otherwise used in the industry. The Court concludes that Mr. Bihlmeyer is unqualified to provide expert testimony as to providing end users of the 1995 Town Car with warnings as to its crashworthiness or the proper method of conveying any such warning.

    **c.**  **Defective manufacture of the accident windshield bonding.**

Defendant seeks to exclude Mr. Bihlmeyer's testimony as to his conclusion that approximately 34% of the windshield bonding in the Town Car at issue was improperly attached on the grounds that he is not an expert on vehicle glass installation.  Plaintiff responds that Mr. Bihlmeyer is "undeniably an expert on roof strength" and that he "worked on" Ford's compliance with various government windshield safety standards.  (Doc. 189).  Plaintiff further notes that Mr. Bihlmeyer will not be offered as to "why or how the windshield was manufactured defectively," but that another expert, Thomas J. Feahney, will testify as to why the windshield separated.  While Mr. Bihlmeyer is certainly qualified to testify as to the structural components of the roof and its overall effect on the windshield, which appears to be an issue of design defect rather than manufacturing defect, plaintiff proffers no facts suggesting that Mr. Bihlmeyer has any qualifications to opine on whether the windshield was properly bonded to the roof during the manufacturing process.  He may be allowed, however, to rely on Mr. Feahney's opinions or testimony in certain respects to inform his own design defect testimony, subject to appropriate objection.

### d.    Roof pillar system and safety restraint system

Defendant seeks to exclude Mr. Bihlmeyer from testifying about the relationship between the roof pillar system and the safety restraint system in the Town Car on the grounds that he is unqualified under the first prong of Daubert.

14

(Doc. 151-2, Ex. "A", p. 13, ¶ G).  Plaintiff responds that Mr. Bihlmeyer's extensive experience in vehicle roof failure analysis renders him qualified to testify as to the effect of the roof deformation on the seatbelt harness.  The safety restraint system in the Town Car is anchored to the roof of the vehicle.  Thus, the effect of the roof's strength on the safety restraint system is a logical extrapolation of Mr. Bihlmeyer's testimony concerning overall roof integrity.  The Court determines the proper course is to allow Mr. Bihlmeyer to testify to the effect of the roof strength on the safety restraint system, which will be undoubtedly subject to vigorous cross examination by defendant.  McDowell, 392 F.3d at 1299.  This portion of the Court's Daubert ruling is without prejudice to defendant making otherwise appropriate objections at trial.

> **e.    Defendant's alleged decision to ignore safety hazards, pass them to consumers and precharge for anticipated products liability costs**

Defendant assails Mr. Bihlmeyer's conclusions that, in essence, defendant knew of the defects in the Town Car and determined not to recall the model because the expense in doing so was more than its calculated products liability exposure, and that defendant simply built its potential exposure into the price of the automobile (items "E" and "F" in defendant's motion).  Defendant asserts that Mr. Bihlmeyer's opinions in this area lack foundation and are merely speculative because he left Ford in 1986 and played no role whatsoever in the decision to

15

send the 1995 Town Car to market.  Plaintiff responds that Mr. Bihlmeyer is entitled to testify concerning his personal knowledge acquired during his tenure with Ford about Ford's knowledge of its vehicles to roll over and its decision to not only sell them, but build its anticipated products liability costs into the cost of the vehicles.

This potential testimony is beyond the pale of <u>Daubert</u>.  Mr. Bihlmeyer's alleged personal knowledge concerning those decisions made by Ford executives is not the kind of "expert" analysis contemplated in <u>Daubert</u>, which requires particularized training, education or experience in a field, that is beyond the purview of a layperson.  Thus, the Court considers this portion of defendants motion as a motion in limine.

Mr. Bihlmeyer's last day of work with Ford was in 1986, long before the 1995 Town Car was designed or manufactured.  Even if Mr. Bihlmeyer claims he obtained particularized knowledge as to defendant's alleged business practices while working for Ford, that is irrelevant to any such decisions defendant made with respect to the Town Car.  Fed.R.Evid. 402.  Thus, this portion of defendant's motion is due to be granted (though plaintiff may proffer outside the presence of the jury if she so decides).

**f.      <u>The cost to render the vehicle non-defective</u>**

Defendant attacks Mr. Bihlmeyer's opinion that to construct the roof

16

according to proper specifications would have cost defendant between $10 - $20 per vehicle (item "G" in plaintiff's motion) on the grounds he is unqualified to make such an assertion.  Plaintiff responds that Mr. Bihlmeyer ought to be allowed to testify concerning the additional cost to defendant to make the Town Car's roof compliant with industry strength standards because of the relatively simple nature of the changes to the thickness of the roof.

When asked during his deposition about the documentation that serves as the basis for the increased cost of $20, Mr. Bihlmeyer stated that, "it's mostly in my head in that I performed those analysis over and over again."  (Doc. 151-9, Ex. "D", August 23, 2005 Bihlmeyer Dep., p. 27, lines 6 - 14).  Since Mr. Bihlmeyer has shown no data whatsoever as to the cost of materials and other items involved in the overall strengthening of the Town Car roof according to his adopted specifications, the Court finds that his methods of essentially conjuring up the $10 - $20 figure, without proffering supporting calculations illustrating how he arrived at those numbers, renders this testimony unreliable under <u>Daubert</u>. Mr. Bihlmeyer, however, is permitted to testify that the engineering aspects of his recommended changes to the Town Car's roof integrity are otherwise simple and would have rendered the Town Car safer.

### g.    Alleged unrelated bad conduct

Defendant posits that plaintiff plans to elicit testimony from Mr. Bihlmeyer

concerning a purported management statement made in the mid-1980's by his former supervisor, Mr. Larry Schrock, which relate to other Ford models, and were not made in the context of the design or manufacture of the 1995 Town Car (item "H" in defendant's motion).  Since this testimony is not "expert" in nature, Daubert does not apply; thus, it will be considered as a motion in limine.  The Court is hard pressed to see how a statement made during Mr. Bihlmeyer's employment with defendant, which ended in 1986, is relevant to the design or manufacture of the 1995 Town Car roof, much less whether it could survive a Rule 403, Federal Rules of Evidence, balancing test.  Thus, the Court grants this portion of defendant's motion; the ruling, however, is without prejudice to plaintiff if defendant opens the door to this evidence during trial.

### 3.    Allan J. Kam

Mr. Kam is a lawyer who served in the Litigation and Enforcement Division of the National Highway Traffic Safety Administration (NHTSA) Office of the Chief Counsel from 1975 - 2000.  (Doc. 147-2, 3 & 4).  During his tenure, Mr. Kam primarily worked on enforcement investigations of the Federal Motor Vehicle Safety Standards (FMVSS).  (Doc. 147-4).  From 1979 - 2000, Mr. Kam served as Senior Enforcement Attorney, in which capacity he oversaw NHTSA's enforcement and related regulatory programs.  (Id.).  While with the NHTSA, Mr. Kam became intimately familiar with NHTSA regulations and practices such as its

processes and procedures in crafting FMVSSs and the application of those rules

to the automotive industry.  (Doc. 147-2).  Since retiring from the NHTSA in 2000,

Mr. Kam, in his capacity as Director of Highway Traffic Safety Associates, LLC,

has provided consulting services concerning FMVSS compliance and regulatory

issues pertaining to the automobile industry.  (Id.).

Defendant seeks to exclude Mr. Kam's testimony on the grounds that it is

improper expert testimony because: (1) it constitutes opinions on purely legal

issues that will encroach on the Court's providence to instruct the jury on the

applicable law; and (2) he lacks the foundation to declare whether various

FMVSSs are insufficient.  (Doc. 147).  Plaintiff responds that she will offer Mr.

Kam for the limited purpose of explaining "what the [NHSTA] is, ... how the

NHSTA arrives at its safety standards," how compliance with FMVSSs is

determined or certified, whether compliance with the applicable safety standards

insulates a manufacturer from tort liability, and the NHTSA's current position

concerning the adequacy of FMVSS 216 to protect vehicle occupants in the event

of a rollover.

The Advisory Committee Notes to the 2000 Amendment to Rule 702

provide that experience alone may provide a sufficient foundation alone for expert

testimony.  Further, Rule 704, Federal Rules of Evidence, allows an expert to

opine on ultimate issues that will be decided by the jury.

Here, Mr. Kam's extensive experience with the NHTSA, how the entity

19

works and the methods it utilizes in promulgating and enforcing FMVSSs, will

assist the trier of fact in understanding the background of the FMVSSs,

compliance with those standards, and what bearing compliance has on whether a

vehicle, such as the Town Car, contains a defect.  Mr. Kam is not directly

testifying, nor is he qualified, on the ultimate issue whether the 1995 Town Car is

defective.  The Court further finds that Mr. Kam's testimony would serve as

proper rebuttal expert testimony if defendant's experts testify that compliance with

FMVSS 216 *ipso facto* renders the Town Car roof defect free.

### 4.    Thomas J. Feahney

Thomas J. Feahney is a mechanical engineer who worked at Ford for

twenty-six years (1957 - 1983).  (Doc. 149-2, Feahney Expert Report).  During his

tenure with Ford, Mr. Feahney had significant involvement in the design,

development, testing and application of glass innovations to improve automotive

safety.  (Id.).  Mr. Feahney was the principal decision maker on three innovations

involving the use of adhesive bonding technology with glass.  (Id.).  The latest

began in the early 1970's concerning the adhesively bonded windshield, which

was adopted under his leadership, and was designed to "reduce the incidence of

windshield separation from the vehicle in foreseeable accidents."  (Id.).  This

innovation replaced the rubber weatherstrips, which attached windshields at that

time, with more sophisticated urethane adhesives.  (Id.).  According to Mr.

Feahney, the significance of the new urethane adhesive is that it increased the overall performance and strength of roof structures in Ford automobiles.  (Id.). Mr. Feahney concludes, *inter alia*, that a manufacturing defect with respect to the bonding in the windshield of the 1995 Town Car at issue caused the windshield to pop out when the car rolled over and allowed the roof to cave in.  (Id.).

Defendant seeks to exclude Mr. Feahney's expert testimony on the grounds that: (a) while Mr. Feahney states there was a manufacturing defect in the bonding of the windshield, he cannot definitively state the nature of the defect or that there were cognizable quality control problems during the manufacturing process of the Town Car at issue (items "A" and "C" in defendant's motion); (b) Mr. Feahney is unqualified to testify as to the kinematics of Mr. Tiller's body inside the vehicle during the crash (item "B" in defendant's motion); (c) Mr. Feahney is unqualified to determine whether the alleged windshield defect rendered the vehicle noncompliant with FMVSS 216 (item "D" in defendant's motion); and (d) Mr. Feahney is unqualified to render an expert opinion about side window glass and that opinion was not properly disclosed pursuant to Rule 26, Federal Rules of Civil Procedure (item "E" in defendant's motion).  (Doc. 149). Plaintiff responds that Mr. Feahney's education, training and extensive experience in the automotive industry concerning installation of glass and windshield technology satisfies the Daubert analysis and renders his expert testimony worthy of jury consideration.  (Doc. 175).

21

### a.   Proper bonding of 1995 Town Car and quality control

Based on his extensive education, training and experience, The Court finds that Mr. Feahney is qualified to provide expert testimony concerning the alleged manufacturing defect in the 1995 Town Car at issue.  Defendant's motion essentially assails the reliability of Mr. Feahney's conclusion that there was a manufacturing defect in the windshield because he cannot pinpoint a discrete installation or bonding problem.

The Supreme Court has emphasized that "[t]he inquiry envisioned by Rule 702 is ... a flexible one," Daubert, 509 U.S. at 594, and must be "tied to the facts of a particular case," Kumho Tire, 526 U.S. at 150.  In certain cases, such as this, the reliability of expert testimony lies in the knowledge and experience of the expert, not in whether his theory has been tested or subject to peer review.  See Fed.R.Evid. 702 Advisory Committee Notes ("Nothing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony....  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony").

As a practical matter, it would be next to impossible for Mr. Feahney to "test" a windshield for the panoply of problems he asserts could have led to the manufacturing defect.  Likewise, there is seemingly no utility in submitting his opinion in this particular case to peer review.  Defendant's strict reliance on the

22

various reliability factors set forth in <u>Daubert</u> ignores the unique nature of the alleged manufacturing defects.  Even though Mr. Feahney cannot point to the precise manufacturing defect that led to the improper bonding of the windshield at issue, the Court nevertheless finds that his extensive training and experience renders his opinion reliable and will assist the trier of fact in the determination of whether there was a manufacturing defect in the windshield bonding.  This includes negligent manufacture or installation of the windshield, and purported problems with quality control.  The Court deems that plaintiff's anticipated vigorous cross examination and presentation of contrary evidence on this issue, rather than the exclusion of Mr. Feahney's testimony, is the proper course of action, <u>see</u> <u>McDowell</u>, 392 F.3d at 1299; thus, defendant's motion is denied on this issue.

### b.    Mr. Tiller's head striking roof of Town Car

Plaintiff states that she will not offer Mr. Feahney to testify as to the cause of his death during the accident, but that Mr. Feahney, an automotive glass expert, is qualified to testify as to his observation that there was an indentation in the headliner of the roof consistent with a human head.  This testimony pertains to the kinematics of Mr. Tiller's body during the accident.  Mr. Feahney admits that he has performed no work concerning occupant kinematics in this case (Doc. 149-3, Feahney Dep., p. 45, lines 12 - 15), and has no knowledge as to the cause

of Mr. Feahney's injury (Id. at p. 29, lines 7 - 22).  Thus, the Court finds Mr.

Feahney is unqualified under Daubert to offer an opinion as to the nature of any

impression on the headliner of the Town Car.

### c.      Failure to meet FMVSS 216

While the Court has no doubt that Mr. Feahney is a qualified expert who

will provide reliable testimony to assist the jury in determining whether any

manufacturing defect in the bonding of the windshield weakened the structural

integrity of the roof of the Town Car, the Court is skeptical as to whether Mr.

Feahney has the requisite qualifications to posit whether this caused the 1995

Town Car to be noncompliant with FMVSS 216.  Since plaintiff has failed to carry

its burden under Daubert on this point, defendant's motion is granted.  This ruling

is without prejudice to plaintiff.  If plaintiff intends to elicit expert testimony from

Mr. Feahney on this issue, it must submit a proffer at trial as to his qualifications

to discuss the alleged manufacturing defect and the impact it had on compliance

with FMVSS 216.  This ruling does not preclude Mr. Feahney from testifying that

the purported manufacturing defect weakened the overall roof structure of the

1995 Town Car at issue.

### d.      Side window glass

Defendant asserts that Mr. Feahney is unqualified to offer expert opinion

concerning the side window glass in the Town Car.  Defendant further states that

24

Mr. Feahney never disclosed in his expert report that laminated glass, as opposed to tempered glass, should have been used in the side windows of the Town Car, which would have prevented Mr. Tiller from being partially ejected out of the driver's side window, if, in fact, that occurred.  Plaintiff states that while this was not contained in his expert report, Mr. Feahney offered this testimony during his October 20, 2004 deposition.  (Doc. 149-3, Feahney October 20, 2004 Dep., p. 26, line 1 - p. 27, line 9).  After hearing argument at the January 20, 2006 hearing, the Court determines that the proper course is to allow the parties to present their experts' differing opinion to the jury on this issue so that neither side is unduly prejudiced.

At this stage, the Court determines that Mr. Feahney is qualified to opine on the efficacy of the side window glass.  Thus, defendant's <u>Daubert</u> motion on this issue is due to be denied.  This ruling, however, is without prejudice if defendant elects to make a timely objection during trial and further illustrate why Mr. Feahney's testimony on this issue does not pass <u>Daubert</u> muster.

**C.    Motions In Limine**

**1.    Plaintiff's Motions in Limine**

**a.    Plaintiff's Motion in limine to exclude mention of initial crash (Doc. 123) and Defendant's motion in limine to admit evidence of initial crash (Doc. 113).**

Plaintiff seeks to exclude any mention of the initial rear-end collision that started the accident sequence in this case on the grounds that it is irrelevant to the determination of liability in a crashworthiness case.  Defendant filed a response to this motion (Doc. 164) and a cross motion (Doc. 113) seeking to admit certain evidence concerning the initial collision, stating that it is necessary to provide the jury a context for how the accident sequence began, and that the initial contact itself is relevant to illustrate the kinematics of Mr. Tiller inside the vehicle prior to the rollover sequence.

In their respective papers, the parties cite the Florida Supreme Court's decision in D'Amario v. Ford Motor Co., 806 So. 2d 424 (Fla. 2001).  In D'Amario, a minor was injured when he was riding as a passenger in a Ford automobile and the driver, who was intoxicated and speeding, struck a tree. 806 So. 2d at 427. Plaintiffs did not seek damages from Ford for the injuries sustained in the initial collision, but sought damages sustained during the fire that engulfed the car after the collision, which was due to an allegedly defective relay switch.  Id.  The trial court held that an apportionment of fault defense was available to Ford pursuant to Fabre v. Marin, 623 So. 2d 1182 (Fla. 1993), and allowed the jury to apportion fault on the verdict form to the driver even under the crashworthiness theory. D'Amario, 806 So. 2d at 428-29.  In light of the trial court's ruling, the parties stipulated that the negligent and excessive speed of the driver caused the initial

accident and that the driver had a .14 blood alcohol content.  Id.  Following deliberations, the jury returned a verdict for Ford, finding that Ford was not the legal cause of the passenger's injuries.  Id. at 428.  The jury did not reach the issue of comparative negligence of the driver on the verdict form.  Id.

The issues before the Supreme Court, *inter alia*, were whether: (1) principles of comparative fault as to the underlying accident apply to a crashworthiness case; and (2) that the introduction into evidence of the driver's fault causing the initial accident confused the jury by focusing attention on the conduct giving rise to the accident instead of the issue of the existence of any defect.  Id. at 440 - 42.  The Court held the principles of comparative fault do not ordinarily apply in a crashworthiness case, and the issue of the driver's intoxication should not have been considered by the jury.  Id. at 442.

Here, the accident sequence began when a Freightliner truck driven by Mr. Hilbert Bihn struck the rear of the Tiller vehicle, which ultimately set in motion an accident sequence, during which the vehicle rolled over.  The issue of Mr. Bihn's negligence is not at issue in this case, and unlike in D'Amario, the parties agree that Mr. Bihn should not be included on the verdict form.  The issue is to what extent the initial accident can be mentioned to the jury.  Apparently, Defendant's theory of the case is that the initial collision caused some structural damage to the 1995 Lincoln Town Car, including the shattering of the driver's side window,

which allowed Mr. Tiller's head to protrude through the driver's side window prior

to the rollover and be exposed to the roadway pavement during the rollover

sequence.

While a significant portion of the facts concerning the initial collision are

irrelevant to determine liability under a crashworthiness theory, Fed.R.Civ.P. 402,

the jury must be provided some context for why the Tiller vehicle was involved in

a rollover accident.  The initial impact of the truck with the Tiller vehicle is, at least

in part, relevant to defendant's theory that the side window was damaged as a

result of the initial impact, allowing Mr. Tiller's head to be exposed through that

window prior to the rollover sequence.  Defendant is permitted to present

evidence describing the initial impact and its purported effect on the Tiller car (i.e.

whether the Tiller vehicle sped up, slowed down, suffered structural damage, and

the effect it had on the kinematics of Mr. Tiller's body inside the vehicle during the

accident sequence).  While the Court recognizes that "the initial collision is

presumed in crashworthiness cases," D'Amario, 806 So. 2d 442, the effect that

the initial accident had on Mr. Tiller's body inside the Town Car is relevant to

whether or not the alleged defect in the Town Car proximately caused Mr. Tiller's

death.  See Griffin v. Kia Motors Corp., 843 So. 2d 336, 339 (Fla. 1st DCA 2003)

(reversing the trial court's decision in a crashworthiness case to allow the jury to

consider the comparative fault of the driver and the injured passenger and noting

that on remand Kia could introduce factual evidence during the crash to support

28

its theory that the accident did not implicate the crashworthiness of the seatback design because a rollover rather than a frontal collision was the proximate cause of the plaintiff's injuries); see also Bearint Ex Rel. Bearint v. Dorel Juvenile Group, 389 F.3d 1339, 1348 (11th Cir. 2004) ("D'Amario provides only that the parties could not litigate the cause of the initial collision between the Dodge van and the Saturn. D'Amario does not prevent the parties from litigating the cause of the alleged enhanced injuries"). Defendant, however, is precluded from mentioning Mr. Bihn's name, the identity of his employer, the settlement of the Freightliner lawsuit, or intimate to the jury that it can ascribe any fault to Mr. Bihn in determining the outcome of this case.  The Court will also consider giving a limiting jury instruction if so requested.

    For the foregoing reasons and the reasons set forth on the record during the January 20, 2006 pre-trial conference, plaintiff's motion (Doc. 164) is **denied,** and Defendant's motion (Doc. 113) is **granted.**



### b.     Motion in limine to exclude mention that Ford employees, consultants and their families drive similar vehicles (Doc. 126).

    For the reasons provided on the record at the December 21, 2005 pre-trial conference, this motion is **granted.**

29

**c.**     **Motion in limine precluding mention of various inadmissible evidence (Doc. 127).**

For the reasons provided on the record at the December 21, 2005 pre-trial conference, this motion is **granted in part and denied in part**.  Defendant will make no mention that Mrs. Tiller would consider purchasing another Town Car or any other Ford product.  However, the remainder of the motion is **denied** as the Court deems that counsel, without necessity of an Order of the Court, will follow the applicable law and not make statements that could conceivably cause a mistrial.

**d.**     **Motion in limine to prohibit inflammatory opening and closing arguments by defendant's counsel (Doc. 128).**

For the reasons provided at the December 21, 2005 pre-trial conference, this motion is **denied.**  The Court presumes that lawyers on both sides will conduct themselves properly during all phases of trial.

**e.**     **Motion in limine to exclude evidence that Ford has "deep pockets" or that plaintiff is only suing due to Ford's wealth (Doc. 129).**

For the reasons set forth at the December 21, 2005 pre-trial conference, this motion is **granted.**

**f.**     **Motion in limine to exclude evidence of defendant's "good acts" or to refer to defendant as the "men and women of Ford" (Doc. 131).**

30

For the reasons set forth at the December 21, 2005 pre-trial conference, this motion is **denied.**

### 2. Defendant's Motion in Limine

#### a. Motion in limine to exclude testimony relating to Volvo (Doc. 114).

Defendant's motion in limine to exclude testimony relating to Volvo crash testing, including, but not limited to the Volvo S80 sedan and the Volvo XC90 is **granted**.  This ruling, however, is without prejudice to plaintiff if defendant opens the door to this issue at trial, or other trial circumstances permit plaintiff's use of it. If plaintiff, in good faith, believes during trial that this occurs, the Court will hear argument from counsel outside the presence of the jury.

#### b. Motion in limine to preclude plaintiff from making references to assorted inadmissible evidence (Doc. 115)

For the reasons set forth during the December 21, 2005 pre-trial conference, this motion is **denied, without prejudice**.  The Court presumes that the parties will not intentionally introduce patently inadmissible evidence or ignore Court Orders on evidentiary rulings.

#### c. Motion in limine regarding the exclusion of evidence that does not comply with Fed.R.Evid. 803(6) (Doc. 116)

For the reasons set forth during the December 21, 2005 pre-trial conference, Defendant's Motion in Limine to Exclude Evidence that does not

Comply with Federal Rule of Evidence 803(6) is **denied**.

### d.    **Motion in limine regarding a failure to warn (Doc. 117)**

For the reasons set forth on the record during the January 20, 2006 pre-trial conference, Defendant's Motion in Limine to Exclude any References to a Failure to Warn (Doc. 117) is **granted**.  Plaintiff may revisit this ruling if it has a legal and factual basis to do so.

### e.    **Remaining Motions in Limine**

The Court was unable to hear argument on the voluminous remaining motions in limine during the December 21, 2005 and January 20, 2006 pre-trial conferences.  Nevertheless, the Court reviewed the parties submissions in their entirety and sets forth its rulings below.  The Court, however, would be remiss if it did not note that many of the motions bear no relation to the issues presented in this crashworthiness case.  The motions simply presume that the attorneys will not conduct themselves ethically and professionally during the trial without an Order of the Court and that the lawyers will not appropriately instruct their witnesses.  The Court will not engage in any such presumption.  If, however, the Court is proven wrong, the Court will take appropriate action.

Accordingly, it is hereby **ORDERED**:

1.    Defendant Ford Motor Company's Renewed And Amended Motion for Summary Judgment on Plaintiff's Claim for Punitive Damages (Doc. 144) is

**GRANTED**;

2.      Defendant's Motion to Limit the Testimony of Plaintiff's Expert Larry L. Bihlmeyer (Doc. 150) is **GRANTED IN PART AND DENIED IN PART,** consistent with this opinion.

3.      Defendant's Motion to Exclude the Testimony of Plaintiff's Expert Allan J. Kam (Doc. 146) is **DENIED**.

4.      Defendant's Motion to Limit the Testimony of Plaintiff's Expert Thomas Feahney (Doc. 148) is **GRANTED IN PART AND DENIED IN PART**, consistent with this opinion.

5.      Plaintiff's Motion in Limine to Exclude Mention of Evidence Regarding the Initial Crash (Doc. 123) is **DENIED**, consistent with this opinion.

6.      Plaintiff's Motion in Limine to Exclude Evidence Concerning Defendant's Employees', Consultants' and/or Their Families' Ownership of Ford Vehicles (Doc. 126) is **GRANTED**.

7.      Plaintiff's Motion in Limine to Preclude Mention of Various Inadmissible Evidence at Trial (Doc. 127) is **GRANTED IN PART AND DENIED IN PART**, consistent with this opinion.

8.      Plaintiff's Motion in Limine to Prohibit Improper and Inflammatory Opening and Closing Arguments by Ford's Counsel (Doc. 128) is **DENIED**.

9.      Plaintiff's Motion in Limine to Exclude Evidence of Regarding

33

Defendant's "Deep Pockets" (Doc. 129) is **GRANTED**.

10.    Plaintiff's Motion in Limine to Exclude Evidence Regarding Defendant's "Good Acts" and to Preclude Referencing the Defendant as the "Men and Women of Ford" (Doc. 131) is **DENIED**.

11.    Defendant's Motion in Limine Concerning Evidence of Initial Rear End Collision (Doc. 113) is **GRANTED,** consistent with this opinion.

12.    Defendant's Motion in Limine to Exclude All References to Volvo, including, but not limited to, the Volvo XC90 (Doc. 114) is **GRANTED**, consistent with this opinion.

13.    Defendant's Motion in Limine to Preclude Plaintiff from making References to Assorted Inadmissible Evidence (Doc. 115) is **DENIED, WITHOUT PREJUDICE**.

14.    Defendant's Motion in Limine to Exclude Evidence That Does Not Comply with Federal Rule of Evidence 803(6) (Doc. 116) is **DENIED**.

15.    Defendant's Motion in Limine to Exclude References to Testimony Regarding a "Failure to Warn" (Doc. 117) is **GRANTED**, consistent with this opinion.

16.    Defendant's Motion in Limine to Exclude References to other Model Vehicles (Doc. 118) is **GRANTED, WITHOUT PREJUDICE**.

17.    Defendant's Motion In Limine to Exclude Evidence of Other Similar

Accidents (Doc. 119) is **GRANTED, WITHOUT PREJUDICE**.

18.      Defendant's Motion in Limine to Respecting Other Unrelated Alleged Defects or Recalls (Doc. 120) is **GRANTED.**

19.      Defendant's Motion in Limine to Exclude Testimony Interpreting the State of Mind or Intentions of Ford Engineers and Executives Based on Engineering Documents (Doc. 121) is **DENIED, WITHOUT PREJUDICE**.

20.      Defendant's Motion in Limine Respecting Evidence Concerning the Grush/Saunby Fuel System Integrity Report (Doc. 122) is **GRANTED**.  Plaintiff is precluded from mentioning the Grush Report unless she receives permission from the Court.

21.      Defendant's Motion in Limine to Preclude Evidence of Well-Known Products Liability Cases (Doc. 124) is **DENIED, WITHOUT PREJUDICE**.

22.      Defendant's Motion in Limine to Preclude Evidence Regarding Ford Pinto and Firestone Tire Recall (Doc. 125) is **DENIED, WITHOUT PREJUDICE**.

23.      Defendant's Motion in Limine Regarding Meeting with President Nixon and his Cabinet in 1971 (Doc. 153) is **DENIED, WITHOUT PREJUDICE**.

24.      Defendant's Motion in Limine to Exclude References to Ford's Marketing or Advertisements (Doc. 132) is **DENIED, WITHOUT PREJUDICE**.

25.      Defendant's Motion in Limine to Exclude Evidence of Television Programs, Newspaper Articles or Other Media Publications (Doc. 133) is

**DENIED, WITHOUT PREJUDICE**.

26.     Defendant's Motion in Limine to Exclude "Fraud-On-NHTSA" Allegations (Doc. 134) is **DENIED, WITHOUT PREJUDICE**.

27.     Defendant's Motion in Limine to Limit Plaintiff's Experts to the Opinions Stated in Their Depositions (Doc. 135) is **DENIED, WITHOUT PREJUDICE**.

28.     Defendant's Motion in Limine Respecting Evidence of Discovery Disputes (Doc. 136) is **DENIED, WITHOUT PREJUDICE**.

29.     Defendant's Motion in Limine to Preclude Arguments or Comments Regarding Ford's Legal Counsel (Doc. 137) is **DENIED, WITHOUT PREJUDICE**.

30.     Defendant's Motion in Limine to Exclude Reference to the Absence or Identity of Ford's Corporate Representative (Doc. 138) is **DENIED, WITHOUT PREJUDICE.**

31.     Defendant's Motion in Limine to Exclude Plaintiff from Asking the Jury to "Send a Message" or Act as "The Conscience of the Community" (Doc. 139) is **DENIED, WITHOUT PREJUDICE**.

32.     Defendant's Motion in Limine to Preclude Introduction of Evidence Concerning Ford's "Purported Safety Policy" (Doc. 140) is **DENIED, WITHOUT PREJUDICE**.

33.     Defendant's Motion in Limine Concerning Evidence Relating to the

Weaver Documents (Doc. 141) is **DENIED, WITHOUT PREJUDICE**.

34.     Defendant's Motion in Limine to Exclude any Reference to Evidence Concerning Ford's Financial Condition (Doc. 142) is **GRANTED**.

35.     Defendant's Objection to Magistrate Judge Snyder's Order Dated January 4, 2006 (Doc. 203) is **OVERRULED** and Magistrate Snyder's Order is **AFFIRMED**.  Further, pursuant to Defendant's Ore Tenus Motion and the Court's Order during the January 20, 2006 pre-trial conference, plaintiff is Ordered to have her experts make a good faith effort to be prepared to testify to the same information which is the subject of Judge Snyder's Order.

36.     Defendant's Ore Tenus Motion to Preclude Plaintiff from Mentioning the Promulgation or Adoption of the Most Recent NHTSA Regulations is temporarily **GRANTED**.  If plaintiff wishes to make a proffer and legal argument why this evidence should be admitted, the Court will listen.

         **DONE AND ORDERED** at Jacksonville, Florida, this 21st day of January, 2006.

                                        TIMOTHY J. CORRIGAN
                                        United States District Judge

t
Copies to: Counsel of Record